William G. Easton, J.
On March 25,1958, for purposes connected with the Niagara Power Project in the Niagara Falls area, the State of New York, on behalf of its Power Authority, *869 appropriated in fee 105.864 acres of claimants’ lands. Prior to the taking, claimants’ premises consisted of 107.889 acres. Claimants’ remaining 2.025 acres were landlocked as result of the appropriation.
The issues here are typical to those frequently raised in subdivision property cases.
The only thing especially significant about this case, or different, from other potential subdivision cases, is the treatment of some of the claimants’ alleged comparables (Nos. 25, 29). These were ordinary straight warranty deeds to the Power Authority. Over the objection of the Attorney-G-eneral, they were received in evidence on the authority of the decision of this court in Hewitt v. State of New York (27 Misc 2d 930) and cases cited therein, which was unanimously affirmed by the Appellate Division, Fourth Department (11 A D 2d 1079 [I960]). That case held that a sale which otherwise would be comparable in the opinion of the Trial Judge, is not necessarily inadmissible simply because the purchaser is the condemnor. (See, also, Matter of City of New York [West Park Slum Clearance Project], 286 App. Div. 821 [1955].)
It is the opinion of this court that these disputed sales, by their dates, property locations, and other features, should be considered as otherwise comparable in this case. They were no farther removed nor were they of any different character than numerous other alleged comparables used by both parties. In fact, four sales used as comparables by the Power Authority and admitted in evidence without objection, being Power Authority’s comparables Nos. 10, 11, 12 and 13, were all transfers to the Niagara Mohawk Power Corporation from which title was later derived by the Power Authority through the so-called package deed. The consideration or considerations which the Power Authority paid to Niagara Mohawk as separately allocated to these four alleged comparables, has never been available.
While these last four named alleged comparables offered by the Power Authority were made to a grantee (Niagara Mohawk) having power of condemnation, yet, they all were consummated pursuant to and at prices fixed by previous options taken by the grantee at much earlier dates, to wit, 1953 and 1954. State’s expert, Hopkins, admitted that in this area the peak of land value ascendency was reached in the Spring of 1958. Because of the rapid rise in real property prices between the years 1950 and 1958 which was acknowledged by all appraisers, very little if any weight has been given to these comparables, because the *870 options antedated the appropriation in this case by four or five years.
The other alleged comparables used by the Power Authority, to wit, comparables Nos. 1, 2 and 9, were likewise discredited. Comparable No. 2 was a transfer in 1954. No. 9 was a transfer ItoUween relatives, father and son, which was in May of 1957 and east (farther removed) of the Power Authority’s comparable No. 2. State’s comparable No. 1 was made pursuant to and at a price established by an option in February of 1955 and its location was likewise east and farther removed from the two previously named comparables.
There was another claimant’s comparable (No. 11) from Brown to the Lutheran Church which consisted of four acres of land at the northeast corner of Upper Mountain Road and Bronson Drive under date of June 19, 1957 conveying four + acres for a consideration of $15,000 reflecting a price per acre of $3,750. This comparable together with comparable No. 25 were almost across the road from claimants’ premises. Comparable No. 25 was from Walter Johnson to the Power Authority dated October 10, 1958 carrying a consideration of $103,000, for 2.294 acres of land on the north side of Upper Mountain Road, as shown on the upper right corner of claimants’ Exhibit 27 as part of a possible subdivision. The Power Authority sought to discredit this comparable on its merits by asserting that the value of claimant’ remaining premises was considerably reduced by the loss of frontage conveyed to the Power Authority. However, it may be observed that had the Power Authority purchased all of grantors’ land which amounted to about 25 acres for the same consideration, it still would have amounted to over $4,000 an acre.
It was conceded by all witnesses that claimants’ premises was zoned residential and that its highest and best use was for residential development. The Power Authority’s experts qualified that classification by questioning whether the time was ripe for its development at the time of the appropriation. With the next breath, however, State’s expert Hopkins admitted that for purposes of his appraisal the time of sellout, whether 1 or 30 years, made no difference. Moreover, it was further admitted that since early in 1957 when public announcement was made of the Power Authority’s project in this vicinity, there existed no practical possibility of the claimants ever developing their premises for residential purposes. In any event, the fact that the property was not in use at the time of appropriation is of no relevance here. All owners have the right to hold property in anticipation of a rising market price or for whatever personal *871 reasons they may have. (Matter of City of New York [Inwood Hill Park], 230 App. Div. 41, affd. 256 N. Y. 556.)
Claimants’ property was located in an area of high-class suburban development extending out from the City of Niagara Falls. There were no lands available within the City of Niagara Falls for any large-scale residential development. Sales of lots in the Glennie and Fairview subdivisions during 1957, 1958 and 1959 as aforesaid, are, in our opinion of substantial probative value here. These subdivisions were recently developed and were located in close proximity to claimants’ lands. The Fairview subdivision being immediately adjacent to claimants’ land consisted of homes in the $20,000 to $40,000 price range. These and other similar sales, and the growth and development of the Niagara Falls area, particularly in the immediate vicinity of claimants ’ property, clearly indicate the reasonable certainty inherent at the time of the taking that claimants’ lands could have and would have been similarly developed in the very near future and that such land was readily marketable for such use at the time of appropriation. (Valley Stream Lawns v. State of New York, 9 A D 2d 149 [1959].)
The State’s experts agree with claimants that the property was best suited for a 220-lot development (Exhibit 31). The lot size in this proposed development was larger than any of the lots sold in the Glennie and Fairview subdivisions mentioned above, and which claimant adduced into evidence as comparable. Zoning posed no problem to such proposed development. A 16-inch water line, electricity and gas were available at the time of the appropriation. There was adequate natural drainage and no fill or excavation was needed. We are satisfied that the highest and best use of claimants’ property at the time of its taking was for residential development into subdivided lots. In our judgment the award here should be based on values reflecting subdivision development of two and one-half lots to the acre and as represented by claimants ’ proposed subdivision development set forth in Exhibit 31.
The State’s principal expert appraiser, Hopkins, testified that in connection with such proposed development the reasonable costs of certain necessary items were as follows: roads, $37,670; water, $88,000; taxes, brokerage fees, advertising, legal, etc. 15% ; profit allocation 20%.
We adopt these figures and find the reasonable cost as set forth above.
In addition to the above items, Mr. Hopkins included a $321,000 figure for a sanitary sewer system. This, we feel, would not have been a necessary or reasonable requirement for *872 development of claimants’ premises. Subdivisions in the immediate area, including the Fairview subdivision immediately adjacent to claimants ’ premises, were developed and were being developed without installation of a sanitary sewer system. Moreover, the State’s'witness, Seebold, with the New York State Department of Health from Niagara County, confirmed this' court’s opinion that a public sanitary sewer system would not have been required in a development of claimants’ property.
In arriving at his market value figure, State’s expert Hopkins used mainly an acreage basis. However, in confirmation of this, he also used the so-called residual process involving the market value of the developed lots as proposed in Exhibit 31 less the development costs as stated above.
In a situation such as is presented here, a distinction between raw acreage and a subdivision value should not be too tightly drawn. (Hazard Lewis Farms v. State of New York, 1 A D 2d 923 [1956].) However, in our view of this record, we arrive at substantially the same value by either method of valuation.
Using both the State’s and claimants’ comparables as to acreage sales in the area, exclusive of sales to the Authority or Niagara Mohawk, by the raw acreage method we would arrive at a price of $3,500 per acre and the value of claimants ’ premises before the taking would be $377,612.
By the subdivision value method, which this court adopts, the sales prices of similar lots during the one-year period before and after the appropriation are the truest and closest indication of the market value of subdivided lots in the area at the time of the appropriation. Many of claimants ’ comparables in evidence, exclusive of sales to the Authority, are within that period and are in the $3,500 to $4,500 price bracket. They were almost adjacent to claimants’ property. Many of these lots were smaller than the lots in claimants’ proposed subdivision and none of the lots were larger than claimants’ proposed lots.
If the claimants’ premises had been subdivided into 220 lots as illustrated in Exhibit 31, the State’s expert having approved this arrangement as a good plan, the lots would be worth according to claimant’s witness, Bowen, $4,500 each and according to State’s witness, Hopkins, $3,400 each.
We conclude that the reasonable market value of lots similar to those proposed by claimants’ was $3,500 each. Thus, the reasonable market value of the completed proposed 220-lot development we find to be $770,000, from which we must deduct and make allowance for the necessary costs of improvements together with expenses for interest, taxes and other costs that would necessarily have been incurred in the development of said *873 land and in making it marketable as a subdivision. The breakdown of these costs and the resultant net is as follows:
Fair Market Value (Before) of Completed Subdivision ...................................... $770,000
Expenses to be deducted as follows:
1. Water .......................... $88,000
2. Roads ........................... 37,670
3. Taxes, advertising, legal etc. (15%) 115,500
4. Profit allocation (20%)...____.... 154,000
Total Expenses ................................. 395,170
Fair Market Value of claimants’ premises as of date
of appropriation .............................. $374,830
Less:
Reasonable market value of claimants’ premises remaining after the appropriation............... 130
Total damages sustained by claimants__________... $374,700
We have given no probative weight to the so-called Package Deed (Exhibit 31) because its over-all purchase price was not broken down to the agreed sale price of each component parcel.
The motion by the State to strike out claimants’ listed com-parables as to which no evidence was adduced is granted.
All other motions upon which decision has been reserved are hereby denied.
The court has viewed the premises.
Claimants are entitled to an award in the sum of $374,700, with interest from March 25, 1958, stipulated as the date of de facto taking, to the date of entry of judgment herein.
This claim has been duly filed, has not been assigned and has not been submitted to any other court or tribunal for audit or determination.
The appropriated premises are described in Exhibits A and B annexed hereto.
The foregoing constitutes the court’s decision herein in accordance with the provisions of section 440 of the Civil Practice Act.